```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA FISH AND BOAT
COMMISSION,

         Plaintiff,

v.                                  Civil Action No. 1:11CV161
                                                       (STAMP)
CONSOL ENERGY, INC.,
CONSOLIDATION COAL COMPANY
and WINDSOR COAL COMPANY,

         Defendants.
```

**MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION TO REMAND,
REMANDING CASE TO THE CIRCUIT COURT OF
MONONGALIA COUNTY, WEST VIRGINIA,
DENYING AS MOOT PLAINTIFF'S MOTION TO
CONTINUE OR, IN THE ALTERNATIVE, MOTION
TO STAY PENDING RULING ON THE MOTION TO REMAND
AND DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS
AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I. Procedural History

The plaintiff, an independent administrative agency of the Commonwealth of Pennsylvania ("the Commonwealth"), filed this action in the Circuit Court of Monongalia County, West Virginia against the defendants Consol Energy, Inc., Consolidation Coal Company, and Windsor Coal Company (collectively "Consol"). The complaint alleges West Virginia common law tort claims against the defendants for alleged damage resulting from the defendants' discharge of waste water into Dunkard Creek in West Virginia, which flows into Pennsylvania. Count One of the complaint asserts a

claim for nuisance, Count Two asserts a claim of trespass, Count Three and Count Four raise claims for negligence and negligence per se, Count Five requests punitive damages, and Count Six alleges strict liability.

Defendants removed the civil action to this Court, asserting removal jurisdiction based upon federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441. In support of this claim, Consol claims that all of the plaintiff's West Virginia common law claims are completely preempted by the Clean Water Act, 33 U.S.C. § 1301, et seq. ("CWA" or "the Act"). In accordance with their assertion that the Commonwealth's claims are completely preempted by the CWA, the defendants also filed a motion to dismiss the Commonwealth's claim as failing to state a claim under the Act. In response, the Commonwealth filed a motion to remand, claiming that its claims are not completely preempted and that, as such, this Court lacks jurisdiction to hear this matter. Following a full briefing of the Commonwealth's motion, Consol filed a motion for oral argument on the remand motion, which this Court granted. On August 20, 2012, oral argument was held before this Court. The Commonwealth's motion to remand, as well as Consol's motion to dismiss are now fully briefed, and this Court has heard oral argument on the issues raised in the motion to remand. For the reasons that follow, this Court grants the Commonwealth's motion to remand and remands this case to the Circuit Court of Monongalia County, West Virginia for

further proceedings. As a result, this Court also denies Consol's motion to dismiss without prejudice subject to refiling in state court.[1]

## II. Facts[2]

Consol discharged chloride into the West Virginia portion of Dunkard Creek over a number of months in 2009. Dunkard Creek in West Virginia flows into the Commonwealth of Pennsylvania at or near Greene County. The Commonwealth alleges that the amount of chloride discharged exceeded the daily maximum effluent limitations allowed under West Virginia National Pollution Discharge Elimination System ("WVNPDES") permits. The Commonwealth also alleges that, at this same time, the levels of total dissolved solids present in the receiving waters were quite high, and that this created the release of toxins from golden algae in Dunkard Creek, which is fatal to fish and other aquatic life. The Commonwealth claims that loss of fish, mussels and mudpuppies within Pennsylvania resulted.

---

[1]On August 31, 2012, the defendants also filed a motion for partial summary judgment, which has not yet been fully briefed. For the same reasons, this motion is also denied without prejudice subject to refiling in state court.

[2]Because the merits of the parties' factual assertions as to the background of this case are largely outside of the scope of this Court's assessment of the remand motion, for the purposes of this opinion, this Court adopts, for the most part, the facts as set forth by the plaintiff in its complaint.

III. <u>Applicable Law</u>

A defendant may remove a case from state court to federal court in instances where the federal court is able to exercise original jurisdiction over the matter. 28 U.S.C. § 1441. Federal courts have original jurisdiction over primarily two types of cases: (1) those involving federal questions under 28 U.S.C. § 1331, and (2) those involving citizens of different states where the amount in controversy exceeds $75,000.00, exclusive of interests and costs pursuant to 28 U.S.C. § 1332(a). The party seeking removal bears the burden of establishing federal jurisdiction. <u>See</u> <u>Mulcahey v. Columbia Organic Chems. Co., Inc.</u>, 29 F.3d 148, 151 (4th Cir. 1994). Removal jurisdiction is strictly construed, and if federal jurisdiction is doubtful, the federal court must remand. <u>Id.</u>

IV. <u>Discussion</u>

Consol removed this action based upon 28 U.S.C. § 1331 federal jurisdiction, arguing that the Commonwealth's state law claims were completely preempted by the CWA. Federal jurisdiction based upon 28 U.S.C. § 1331 requires that a question "arising under the Constitutions, laws, or treaties of the United States" be present on the face of the plaintiff's well pleaded complaint. <u>See</u> <u>Franchise Tax Bd. v. Constr. Laborers Trust</u>, 463 U.S. 1, 10 (1983). This requirement is rooted in the concept that the plaintiff is the master of his own complaint, and can choose to rely upon state law

alone in his pleading if he so chooses. Accordingly, the federal question "must be an element, and an essential one, of the Plaintiff's cause of action." Id. at 10-11 (internal citations omitted). The simple existence of a federal issue, or a federal defense is insufficient to support this type of jurisdiction. Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 813 (1986).

However, there is an exception to the well pleaded complaint rule in cases where a plaintiff's complaint contains state law causes of action which are subject to complete preemption by federal law. In these situations, the state law cause of action actually pled "transform[s]" into a federal claim by operation of law, and removal is proper. See Lontz v. Tharp, 413 F.3d 435, 441 (4th Cir. 2005). Due to severe implications upon federalism, complete state law preemption is extremely rare. Id. When asked to apply such a rarely employed concept, courts must consider the strong presumption against it and only find complete preemption in situations where Congress has provided a "clear and manifest purpose" to preempt all state law causes with a federal statute. Id.

Further, it is important to note that, in order for a cause of action which employs state law alone to be removable based upon preemption of federal law, the preemption must be complete. That is to say, of the types of preemption, conflict or "ordinary," and complete, only complete preemption creates federal jurisdiction

over a complaint employing state law alone on its face. <u>Id.</u> While the complete preemption doctrine entirely supplants any state action in situations covered by the preempting federal law, "ordinary" preemption merely serves as a federal defense to a state law claim, or an assertion that a federal law provides the standard by which a claim must be evaluated. <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386, 393 (1987). This type of preemption will not support federal jurisdiction. As such, in order to support removal jurisdiction in this matter, Consol must show that "Congress intended [the federal claim] to be the exclusive remedy for the alleged wrong" asserted by the Commonwealth. <u>King v. Marriott Int'l, Inc.</u>, 337 F.3d 421, 425 (4th Cir. 2003). This, Consol is unable to do.

The 1972 amendments to the Federal Water Pollution Control Act, which would become the CWA, constituted an effective total rewriting of the Act and, most significantly, instituted the National Pollution Discharge Elimination System ("NPDES") which requires a permit to be issued in order for any entity to legally discharge <u>any</u> effluent into any interstate water. 33 U.S.C. § 1311; <u>and see</u> <u>Milwaukee v. Illinois</u>, 451 U.S. 304, 317-318 (1981) ("Milwaukee II"). NPDES permits are generally issued by the Environmental Protection Agency ("EPA"), but the Act recognizes the importance of and encourages significant participation of the states in the regulation of discharges within their own borders.

33 U.S.C. § 1342(b); and Int'l Paper Co. v. Ouellette, 479 U.S. 481, 489 (1987). Accordingly, the Act allows for the EPA to delegate to state agencies the authority to issue permits and administer the NPDES program within the state when the state program complies with the mandates of the CWA. Id. at 489-90. Further, the Act provides that states may require more stringent effluent limitations than required by the CWA in NPDES permits issued to dischargers within the state, and requires that the EPA certify with the source state that a permit issued by the EPA complies with the state's standards.

With this background of the regulatory scheme in mind, the United States Supreme Court in Int'l Paper Co. v. Ouellette expressly found that the CWA does not completely preempt all state common law claims. 479 U.S. at 492-93. In that case, Vermont citizens brought a state common law action under the laws of Vermont against the International Paper Company ("IPC"), based upon its discharge of effluents into Lake Champlain in New York, which discharge flowed into the Vermont side of the lake. Id. at 484. The Supreme Court held that, while the Vermont citizens' claims were preempted by the CWA because the Act foreclosed lawsuits which sought to enforce the laws of an affected state against an out-of-state discharger, the claims would have been proper and not preempted had they been brought under the laws of the state in which IPC was discharging, in that case, New York.

7

In reaching this holding, the Court found that federal law governs interstate water pollution, and that the comprehensive nature of the CWA is such that the only state law causes of action which could remain would be those specifically reserved by the Act. See id. at 492. It then found that the regulatory partnership created between the federal and state governments in the CWA, as well as two savings clauses contained in the Act, stood as evidence that Congress intended to allow some state law causes of action to remain available to litigants as viable vehicles for redress. Id. ("Although Congress intended to dominate the field of pollution regulation, the saving clause negates the inference that Congress 'left no room' for state causes of action."). These clauses, § 510 and § 505(e) of the citizen suit provision of the Act, provide as follows:

> Except as expressly provided in this Act, nothing in this Act shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

§ 510; 33 U.S.C. § 1370.

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . .

§ 505(e); 33 U.S.C. § 1364(e).

However, the Supreme Court found that the savings clauses limited the state law claims which remained. The Court held that the overall scheme of the Act, in addition to the fact that

§ 505(e) limits the states' remaining regulatory rights to the states' own waters, required that the law of an affected state not be used to regulate the discharge of effluents into the waters of another state. Oullette, 479 U.S. at 494-499. The Court's central concern in determining that the application of state law in this way was preempted, was that such application would "interfere with the methods by which the [CWA] was designed to meet its goal." Id. at 494 (citing Mich. Canners & Freezers Assn. v. Agricultural Marketing & Bargaining Bd., 467 U.S. 461, 477 (1984)). The Act only allows source states, along with the federal government, to regulate dischargers. Accordingly, allowing affected states to use civil litigation to apply their own laws, which may require more stringent effluent limitations than the NPDES permits held by out-of-state dischargers, would allow affected states to indirectly regulate out-of-state dischargers, thus frustrating the Act's purpose of developing "clear and identifiable requirements" through standardized NPDES permits. See id.; and S. Rep. No. 94-414, p. 81 (1971), 2 Leg. Hist. 1499.

The Court found, however, that because the source state issues the NPDES permit, and is permitted to impose state law upon in-state dischargers so long as state law does not fall below the requirements set by the CWA, application of source state common law "would not frustrate the goals of the CWA." 479 U.S. at 498-99. The Court held that the discharger is already subject to the source

state laws, and thus the "imposition of source-state law does not disrupt the regulatory partnership established by the permit system" and does not create the concern of "being subject to an indeterminate number of potential regulations."  Id. at 499.  As such, the Court held that the Act does not preempt the application of source state law so long as that law does not conflict with the requirements of the CWA.

Consol acknowledges the holding of Ouellette, and that the Commonwealth's claims, brought under the law of the source state, are in line with the state law claims found to be preserved in that case.  However, Consol argues that the holding of Ouellette is distinguishable from this case because the Supreme Court's holding in Ouellette must be limited to suits brought by individuals rather than to suits brought by sovereign states, as is the case here.  In such a case, Consol encourages this Court to apply Illinois v. Milwaukee, 406 U.S. 91 (1972) ("Milwaukee I"), and Milwaukee II, 451 U.S. 304, as well as the reasoning in Ouellette, to find that all state law claims brought by an affected state are completely preempted, without regard to whether the affected state bases its claims upon the source state's law.  After thorough review, this Court cannot make such a finding.

In Milwaukee I and Milwaukee II, the United States Supreme Court held that federal law governed the regulation of interstate water pollution.  Milwaukee I, decided before the 1972 amendments,

10

held that in order to create a "uniform standard with the environmental rights of a State against improper impairment of sources outside of its domain[,]" federal common law, rather than state common law, was the proper controlling law over claims of interstate water pollution. 406 U.S. at 107, n.9 (quoting Texas v. Pankey, 441 F.2d 236, 241-42). Milwaukee II, issued as a response to an attempt by the State of Illinois to utilize federal common law after the 1972 amendments, found that as a result of the amendments, federal common law is completely preempted because Congress utilized the statutory scheme of the CWA to create a comprehensive regulatory program and thus "has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence." 451 U.S. at 317.

In support of its contention that the reasoning of Milwaukee I and Milwaukee II require that Ouellette be limited to suits brought by individual plaintiffs, Consol argues that allowing affected states to bring state law claims under source state law does the same damage contemplated in those cases with regard the application of affected state law to the regulation of interstate water pollution. Thus, Consol argues, as was found with regard to the preemption of federal common law in Milwaukee II, the regulatory scheme created by Congress in the CWA does not leave

room for the application of state law in this way. This Court disagrees.

In <u>Ouellette</u>, the court, relying on the opinions in three <u>Milwaukee</u> cases,[3] pointed to two main bases for finding federal preemption of the use of affected state law against out-of-state dischargers. First, the Court found that the application of a state's common law to out-of-state dischargers would frustrate the goals of uniform standards for regulation of interstate water pollution, and would result in confusion and disjointed, unforeseen obligations for dischargers. 479 U.S. at 496 ("The application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty.").

Second, it was determined that allowing affected states to apply their own law in civil suits against out-of-state dischargers would result in an ability to circumvent the Act's limitation on non-source states' ability to participate in the regulation of out-of-state dischargers by allowing them to indirectly regulate such actors. <u>See</u> <u>id.</u> at 495. This Court finds that neither of these concerns exist in this case.

Initially, it is noted that, while Consol heavily relies upon the <u>Milwaukee II</u> decision to support its contention that the

---

[3]The <u>Ouellette</u> court also relied on the reasoning of the Seventh Circuit in <u>Illinois v. Milwaukee</u>, 731 F.2d 403 (1984) ("<u>Milwaukee III</u>"), the opinion which resulted from the remand in <u>Milwaukee II</u>, and which found in line with the Supreme Court's ultimate holding in <u>Ouellette</u>.

Commonwealth's claims are completely preempted by the CWA, this Court notes, as did the Supreme Court in Milwaukee II, that the standard by which a court finds preemption of federal common law is notably lower than the standard by which a court may find complete preemption of state law. 451 U.S. at 316-17 ("Such concerns [of federalism] are not implicated in the same fashion when the question is whether federal statutory or federal common law governs, and accordingly the same sort of evidence of a clear and manifest purpose is not required."). Further, while it is undisputed that the Milwaukee II court found that the CWA preempted federal common law, and clearly determined that the CWA is the law in the field of interstate water pollution, it did not reach a determination as to the scope of the savings clauses within the CWA. Id. at 310 n.4. One conclusion it did reach, however, was that while the CWA did not specifically preserve federal common law, it did specifically preserve states' rights to and jurisdiction "with respect to the waters (including boundary waters)" in the § 510 savings clause. 33 U.S.C. § 1370; 451 U.S. at 327-28. Finally, Consol fails to address Milwaukee III, where on remand, the Seventh Circuit found that, had the State of Illinois' claims been based upon the source state law, they would not be preempted by the CWA, which finding was seemingly endorsed by the Supreme Court in Ouellette. See 731 F.2d at 414-15; 479 U.S. at 485-88.

In addition to these issues with regard to the defendants' offering of proof of Congress' clear and manifest intent to completely preempt the Commonwealth's claims under West Virginia law, the concerns of conflict between state law and the CWA found in Ouellette are not present in this case. Id. at 499. First, as stated above, the chief concern with regard to the application of affected state laws to out-of-state dischargers is that the uniformity of obligation sought by the CWA would be wholly undermined. This is not a concern when an affected state seeks to enforce source state law. This issue of conflict articulated in Ouellette focused solely upon the law enforced against the discharger, not the litigant enforcing that law. If the source state law is used, no matter who brings the claims, the discharger will be subject only to the federal law and the source state law, as was contemplated by the Court in Ouellette. Id. at 498-99. At oral argument, the defendants argued that allowing states to bring these actions would open the gates for other states downstream to bring such lawsuits, thus exposing a discharger to liability to a possibly unlimited number of affected states. (Hr'g Tr. *24) However, this does not undermine the goal of uniformity of obligations. Liability to a number of affected downstream states poses no greater concern than liability to any number of citizens from any number of affected downstream states. Further, the only

standards of liability to which the discharger is held remain those of the source state and the CWA.

Additionally, Consol argues that the Commonwealth here is attempting to circumvent the CWA's limitations on regulation of dischargers through indirect regulation of the defendants by way of this lawsuit. This argument too is without merit. This Court does not quarrel with the Consol's assertion that the CWA precludes the Commonwealth from regulating, in its capacity as a sovereign law-making and law-enforcing entity, the defendants' discharge of effluents into West Virginia waterways. See Ouellette, 479 U.S. at 495, 497-98; and 33 U.S.C. § 1370 ("[N]othing in this Act shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the states with respect to the waters (including boundary waters) of such states.") (emphasis added).

However, the Commonwealth is not attempting to, as Consol repeatedly quotes from Milwaukee II, establish "more stringent standards applicable to out-of-state dischargers." 451 U.S. at 327-28. In this case, the Commonwealth is not acting as a sovereign law-making and law-enforcing entity. Rather, it is acting as an aggrieved litigant seeking redress within West Virginia courts, for an alleged harm resulting from a perceived violation of laws created by the State of West Virginia, which were already applicable to the defendants by virtue of their discharge of effluents into West Virginia waterways. No more indirect

15

regulation of an out-of-state discharger can occur as a result of this litigation than could result from the same suit being raised by a private citizen of the Commonwealth of Pennsylvania.

Finally, there has not been presented, nor could this Court find, any indication within the CWA or any of the cited Supreme Court precedent of an intent to treat sovereign states acting as plaintiffs any differently than private individual plaintiffs. First, as indicated above, the court in <u>Ouellette</u> cited with approval the Seventh Circuit's finding in <u>Milwaukee III</u> that the State of Illinois' claims, if brought under the source state's law, would not be preempted by the CWA.  479 U.S. at 485-88. Additionally, while concern was expressed for non-source state regulation of dischargers, the focus within <u>Ouellette</u>, as well is in both Supreme Court <u>Milwaukee</u> opinions, was on the enforcement of non-source state <u>laws</u> upon dischargers, i.e., litigants asking courts to enforce affected state laws on out-of-state dischargers. No mention was made of concern for the party bringing such a state law action, even when the plaintiff in the <u>Milwaukee</u> cases was a sovereign state.

Nor does the CWA draw any differentiation between states acting as plaintiffs in civil litigation and any other type of litigant that may bring an action based upon water pollution.  In § 1362, the definitions section of the Act, subsection five defines the term "person" as it is used in the Act to include "individual,

16

corporation, partnership, association, State, municipality, commission, or political subdivision of a state, or any interstate body." 33 U.S.C. § 1362(5) (emphasis added). In 33 U.S.C. § 1365, the citizen suit provision of the Act, the CWA indicates that any "citizen" may commence a civil action on his behalf under the Act, and that a "citizen" is defined as a "person or persons having an interest which is or may be adversely affected." §§ 1365(a) & (g). The savings clause of the citizen suit provision, quoted in full above, goes on to assert that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law . . . ." § 1365(e) (emphasis added). This Court further notes that, at oral argument, the defendants conceded that the terms of the Act made a citizen suit available to the Commonwealth. (Hr'g Tr. *25)  In short, the defendants have provided this Court no basis upon which to find that Congress even contemplated any difference between suits brought by private individuals and suits brought by States, let alone that Congress intended to eliminate all state law actions brought by a sovereign state in this situation.  Just as the Supreme Court held in Ouellette that the Act preempts laws, not courts, so does this Court conclude that the Act preempts laws, not parties.  479 U.S. at 500.

Accordingly, this Court finds, as Consol argues, and as it must based upon the United States Supreme Court's findings in the

17

Milwaukee cases, that federal law, and specifically the CWA, governs actions based upon interstate water pollution. At the same time, this Court finds that the CWA specifically preserves the availability of state law rights of action brought by any "person" as defined by the Act, under the law of the source state. See 33 U.S.C. § 1362(5). Accordingly, the Commonwealth's West Virginia common law claims are not completely preempted by the CWA, and this Court lacks jurisdiction to adjudicate this action. As a result, this Court also lacks jurisdiction to decide Consol's motion to dismiss and motion for partial summary judgment, and must accordingly deny the motions as moot, but without prejudice subject to refiling in state court.

## V. Conclusion

For the reasons stated above, the plaintiff's motion to remand (ECF No. 8) is GRANTED. Accordingly, the plaintiff's motion to continue, or in the alternative, motion to stay pending ruling on the motion to remand (ECF No. 45) is DENIED AS MOOT. The defendants' motion to dismiss (ECF No. 23) and the defendants' motion for partial summary judgment (ECF No. 53) are DENIED AS MOOT. Accordingly, this matter is hereby REMANDED to the Circuit Court of Monongalia County, West Virginia.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein and to the Clerk of

18

the Circuit Court of Monongalia County, West Virginia.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:    September 4, 2012

<pre>
                              /s/ Frederick P. Stamp, Jr.
                              FREDERICK P. STAMP, JR.
                              UNITED STATES DISTRICT JUDGE
</pre>